IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LINDA L. BURR,

        Plaintiff,

v.                              Civil Action No. 5:06-cv-35

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.    <u>Background</u>

    Plaintiff, Linda L. Burr, (Claimant), filed her Complaint on March 30, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on July 26, 2006.[2]  Claimant filed her Motion for Summary Judgment on August 25,

2006.[3]  Commissioner filed his Motion for Summary Judgment on September 25, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

        2.    <u>Commissioner's Motion for Summary Judgment</u>.

---

    [1] Docket No. 1.

    [2] Docket No. 7.

    [3] Docket No. 10.

    [4] Docket No. 11.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so the ALJ may more thoroughly explain his analysis of Claimant's impairments compared to medical listing 1.00 and so the ALJ may retain a medical expert to testify regarding the severity of Claimant's fibromyalgia, arthritis, and asthma during the relevant time period.

2.     Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits on July 19, 2000.  An unfavorable decision was rendered at the initial level of consideration on December 1, 2000. Claimant did not request further review of that decision.  Claimant then filed an application for Disability Insurance Benefits and Supplemental Security Income on October 23, 2001, alleging disability since August 1 ,2001.  The application was denied initially and on reconsideration. Claimant requested review by an ALJ and received a hearing on December 11, 2003.  The ALJ issued a partially favorable decision on February 3, 2004.  The ALJ determined Claimant was disabled since October 16, 2003.  Claimant requested review by the Appeals Council, but it denied this request on September 8, 2005.  On February 16, 2006, the Appeals Council set aside its earlier decision to consider additional evidence and again denied the request for review. Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 48 years old on the date of the December 11, 2003 hearing before the ALJ.

Claimant has a high school equivalent education. Claimant has prior relevant work experience as

a nurse's aide, a cook, and a sitter for handicapped persons.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: August 1, 2001 – October 15, 2003.[5]

**Glenn L. Scott, M.D., P.A., 5/5/99, Tr. 181**
Impression: infrapatellar neuropraxia or neuroma, possible internal derangement

**Frank Phillips, M.D., 5/26/99, Tr. 186**
Pre-operative diagnosis: internal derangement, right knee
Post-operative diagnosis: medial meniscal tear, right knee, chondromalacia of the right knee,
synovitis of the right knee

**Frank Phillips, M.D., 5/25/99, Tr. 193**
Impression: normal PA and lateral chest

**Frank Phillips, M.D., 2/10/99, Tr. 195**
Impression: small effusion, linear signal at the posterior horn of the lateral meniscus, probably
due to degeneration

**Jane Wasson, M.D., 1/22/99, Tr. 200**
Impression: normal right knee series

**John Stowell, M.D., 12/17/98, Tr. 203**
Diagnostic impression: solid lesion, palpable, left breast, rule out malignancy

**Frank Phillips, M.D., 8/26/99, Tr. 220**
Diagnosis: s/p knee arthroscopy

---

[5] Much of the evidence in the record comes from before Claimant's alleged onset date of
disability.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim.
See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d
1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y.
2004).

**Frank Phillips, M.D., 6/1/99, Tr. 222**
Diagnosis: s/p knee arthroscopy

**Frank Phillips, M.D., 6/1/99, Tr. 222**
Diagnosis: s/p knee arthroscopy

**Frank Phillips, M.D., 2/9/99, Tr. 226**
Diagnosis: right knee pain

**Frank Phillips, M.D., 1/25/99, Tr. 227**
Diagnosis: contusion of the right knee

**Physical Residual Functional Capacity Assessment, 11/29/00, Tr. 231**
Exertional limitations
　　　Occasionally lift and/or carry 50 pounds
　　　Frequently lift and/or carry 25 pounds
　　　Stand and/or walk about 6 hours in an 8 hour work day
　　　Sit for a total of about 6 hours in an 8 hour work day
　　　Push and/or pull: unlimited

Postural limitations
　　　Balancing, stooping, kneeling, crouching, crawling: frequently
　　　Climbing: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Psychiatric Review Technique, 11/21/00, Tr. 244**
Medical disposition: impairments not severe

Affective disorders
　　　The person has a medically determinable impairment.  The impairment written is
illegible.

Functional limitation and degree of limitation
　　　Restriction of activities of daily living, difficulties in maintaining social functioning,
difficulties in maintaining concentration, persistence, or pace: mild
　　　Repeated episodes of decompensation, each of extended duration: none

**Jane Wasson, M.D., 11/20/98, Tr. 282**
Impression: essentially negative chest.  There is bilateral ductal dilatation in the retroareolar
area.  There are asymmetrical changes in the breast density.  The left breast at the upper outer

quadrant has relatively denser density compared to the right. There is no evidence of malignancy.

**Jane Wasson, M.D., 11/8/97, Tr. 284**
Clinical diagnosis: back pain

Impression of the lumbar spine: essentially negative

Impression of the thoracic spine: minimal anterior osteophyte formation at the lower t-spine. There is no evidence of acute bone injury.

Impression of cervical spine series: essentially negative cervical spine, l-spine. There is osteophyte formation at the t-spine. There is no definite evidence of fracture.

**Sheila Wendler, M.D., 11/22/01, Tr. 287**
Admitting impression:
Axis I: benzodiazepine, opiod abuse/dependence, substance-induced mood disorder, depressive disorder, not otherwise specified
Axis II: deferred
Axis III: fibromyalgia, arthritis
Axis IV: financial and occupational problems, family conflict
Axis V: 50

Principal diagnosis: depressive disorder, not otherwise specified

Secondary diagnosis: benzodiazepine, opiod abuse/dependence, substance-induced mood disorder, fibromyalgia, arthritis, financial problems, occupational problems, family conflict, Axis V: 50

**Sheila Wendler, M.D., 11/14/01, Tr. 295**
Admitting impression:
Axis I: benzodiazepine, opioid abuse/dependence, substance-induced mood disorder, depressive disorder, not otherwise specified
Axis II: deferred
Axis III: fibromyalgia, arthritis
Axis IV: financial problems, occupational problems, family conflict
Axis V: 50

**Psychiatric Review Technique, 12/27/01, Tr. 298**
There is insufficient evidence.

**Physical Residual Functional Capacity Assessment, 12/27/01, Tr. 312**
Exertional limitations
        Occasionally lift and/or carry 20 pounds

Frequently lift and/or carry 10 pounds
Stand and/or walk for a total of about 6 hours in an 8 hour work day
Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations
Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limtiations
Wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation: unlimited
Extreme cold, extreme heat, vibration, hazards: avoid concentrated exposure

**Physical Residual Functional Capacity Assessment, 5/8/02, Tr. 322**
Exertional limitations
Occassionally lift and/or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk about 6 hours in an 8 hour work day
Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations
Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: (nothing checked)
Visual limitations: none established
Communicative limitations: none established
Environmental limitations:
Extreme cold, extreme heat, wetness, humidity, noise, vibration: unlimited
Fumes, odors, dusts, gases, poor ventilation, hazards: avoid concentrated exposure

**Arturo Sabio, M.D., 6/28/02, Tr. 330**
Diagnostic impression: fibromyalgia by history, ulnar neuropathy left arm, history of bronchial
asthma, chronic bronchitis and history of tobacco abuse

**Dean R. Ball, D.O., 6/25/02, Tr. 336**
Impression: mild degenerative changes lumbar spine

**Lois Holloway, M.S., 7/16/02, Tr. 338**
WAIS III
Verbal IQ: 76
Performance IQ: 90

Full scale IQ: 80

Verbal Comprehension Index: 82
Perceptual Organization Index: 95
Working Memory Index: 67

The results are considered valid.

WRAT-3
Reading: 86 (standard score), high school (grade equivalent)
Spelling: 88 (standard score), 8 (grade equivalent)
Arithmetic: 76 (standard score), 5 (grade equivalent)

Diagnoses:
Axis I: major depressive disorder, recurrent, moderate, panic disorder without agoraphobia, sedative hypnotic-anxiolytic abuse, by history, opioid abuse, by history
Axis II: personality disorder not otherwise specified with borderline and dependent features
Axis III: reported fibromyalgia, reported arthritis

**Psychiatric Review Technique, 8/2/02, Tr. 345**
A residual functional capacity assessment is necessary.

**Mental Residual Functional Capacity Assessment, 8/2/02, Tr. 360**
Understanding and memory
The ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to remember detailed instructions: not significantly limited

Sustained concentration and persistence
The ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, the ability to make simple work-related decisions: not significantly limited
The ability to maintain attention and concentration for extended periods, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

Social interaction
The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers without distracting

them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation
    The ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation: not significantly limited
    The ability to set realistic goals or make plans independently of others: moderately limited

**M. Khalid Hasan, M.D., F.A.P.A., 4/4/02, Tr. 363**
Psychiatric diagnoses:
Axis I: major depression, recurrent, moderate to moderately severe in nature, history of alcoholism, in remission for the past several years as per the patient
Axis II: none
Axis III: status post partial hysterectomy, status post cholecystectomy, ear surgery, history of hiatus hernia, status post surgery to the right knee, fibrocystic disease of the breast
Axis IV: GAF 55-60

**West Virginia Department of Human Services, (Undated), Tr. 370**
Diagnosis: right knee pain, fibromyalgia, shoulder pain, migraines, depression

Prognosis: guarded

**Charles S. Scharf, M.D., 6/21/03, Tr. 379**
The patient is diagnosed with psychotic depression.

**John Good, M.D., 10/14/02**
Impression:
Axis I: major depressive disorder, recurrent, severe without psychotic features, post-traumatic stress disorder
Axis II: borderline personality disorder
Axis III: fibromyalgia, hypothyroidism
Axis IV: psycho-social stressors, severe
Axis V: GAF of 55

**Joseph P. Ross, M.D., 9/16/99, Tr. 385**
Conclusion: previous surgery at the gastroesophageal junction with deformity, no recurrent hernia or reflux.

**(Unsigned), 6/99/99, Tr. 386**
Impression: hypotensive LES with short intra-abdomenal and total length, normal relaxation with swallow, normal peristalsis and amplitudes in the esophageal body, normotensive UES coordinated with pharyngeal contraction

**Hugh T. James, M.D., 7/1/99, Tr. 445**
Principal diagnosis: esophageal reflux

Secondary diagnoses: diabetes without complications, type II, unspecified, not uncontrolled, obesity, unspecified, depressive disorder NEC, personal Hx of venous thrombosis and embol, other diseases of the lung NEC, tobacco use disorder

**Hugh T. James, M.D., 7/3/99, Tr. 448**
Discharge diagnoses: refractory esophageal reflux disease, borderline diabetes, lung disease, history of obesity, blood transfusions, emotional instability, previous deep vein thrombosis

**Hugh T. James, M.D., 7/1/99, Tr. 450**
Pre-operative diagnosis: esophageal reflux disease, refractory medical treatment

Post-operative diagnosis: same

**Hugh T. James, M.D., 6/23/99, Tr. 454**
Assessment: refractory gastroesophageal reflux disease, history of borderline diabetes, history of lung disease, history of blood transfusion, obesity, history of emotional instability, history of previous deep vein thrombosis

**Hugh T. James, M.D., 6/29/99, Tr. 455**
Ord. diagnosis: surgery
Conclusion: negative chest

**Hugh T. James, M.D., 6/1/99, Tr. 466**
Ord. diagnosis: abdominal pain unspecified

Conclusion: negative

**Hugh T. James, M.D., 5/27/99, Tr. 467**
Ord. diagnosis: heartburn

Impression: normal gastric emptying at 90 minutes of 54 percent

**Michael D. Morrello, M.S., 10/16/03, Tr. 486**
WAIS III
      Verbal IQ: 78
      Performance: 78
      Full scale IQ: 76

WRAT-3
      Reading: 48 (raw score), 98 (standard score), PHS (grade score)
      Spelling: 35 (raw score), 83 (standard score), 7 (grade score)

Arithmetic: 32 (raw score), 75 (standard score), 5 (grade score)

Diagnostic impression:
Axis I: major depressive disorder, recurrent, severe, anxiety disorder
Axis II: none
Axis III: carpal tunnel syndrome and fibromyalgia
Axis IV: economic problem, low income, vocation problem, unemployed
Axis V: GAF of 50

## Psychiatric Review Technique, 11/11/03, Tr. 494

The patient has a depressive syndrome characterized by the following: anheadonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, decreased energy, feelings of guilty or worthlessness, difficulty conceiving or thinking, thoughts of suicide, and hallucinations, delusions or paranoid thinking

The patient has generalized persistent anxiety accompanied by the following: motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning.

Functional limitations and degree of limitation
    Difficulties in maintaining concentration, persistence or pace: moderate
    Restriction of activities of daily living, difficulties in maintaining social functioning: marked
    Episodes of decompensation, each of extended duration: three

The patient has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the person to decompensate.

## Mental Residual Functional Capacity Assessment of Work-Related Abilities, 11/11/03, Tr. 508

Limitations in understanding, remembering, and carrying out instructions
    Understand and remember short, simple instructions, carry out short, simple instructions: slight
    Understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work-related decisions: moderate

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines
    Sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality: slight
    Completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

Limitations in social functioning in a normal competitive work environment
    Maintaining acceptable standards of courtesy and behavior: slight
    Interacting appropriately with the public, responding appropriately to direction and criticism from supervisors, working in coordination with others without being unduly distracted by them, working in coordination with others without unduly distracting them, maintaining acceptable standards of grooming and hygiene, relating predictably in social situations in the work place without exhibiting behavioral extremes, demonstrating reliability, ability to ask simple questions or request assistance from co-workers or supervisors: moderate

Adaptation in a work setting
    Ability to be aware of normal hazards and take appropriate precautions: slight
    Ability to respond to changes in the work setting or work processes: moderate

Functioning independently in a competitive work setting
    Traveling independently in unfamiliar places: slight
    Carrying out an ordinary work routine without special supervision, setting realistic goals and making plans independently of others: moderate

Limitations in work adjustment
    Ability to tolerate ordinary work stress: moderate

## **Mental Residual Functional Capacity Assessment of Work-Related Abilities, 11/14/03, Tr. 513**

Limitations in understanding, remembering, and carrying out instructions
    Understand and remember short, simple instructions, carry out short, simple instructions: slight
    Understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work-related decisions: moderate

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines
    Sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: marked

Limitations in social functioning in a normal competitive work environment
    Maintaining acceptable standards of grooming and hygiene: none
    Interacting appropriately with the public, maintaining acceptable standards of courtesy and behavior, relating predictably in social situations in the work place without exhibiting behavioral extremes, ability to ask simple questions or request assistance from co-workers or supervisors: slight
    Responding appropriately to direction and criticism from supervisors, working in co-ordination with others without unduly distracting them, demonstrating reliability: moderate

Adaptation in a work setting

       Ability to respond to changes in the work setting or work processes, ability to be aware of normal hazards and take appropriate precautions: moderate

Functioning independently in a competitive work setting

       Carrying out an ordinary work routine without special supervision, setting realistic goals and making plans independently of others: slight

       Traveling independently in unfamiliar places: moderate

Limitations in work adjustment

       Ability to tolerate ordinary work stress: marked

Do you feel that the impairments and limitations which you have identified have probably existed at their current level of severity since 8/3/01, the alleged onset date? Yes.

## Psychiatric Review Technique, 11/14/03, Tr. 518

Organic mental disorders

       The patient has a memory impairment, perceptual or thinking disturbances, change in personality, disturbance in mood, and emotional lability and impairment in impulse control

Affective disorders

       The patient has a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by: depressive syndrome characterized by at least four of the following:

              Anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking

Functional limitation and degree of limitation

       Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: moderate

       Episodes of decompensation, each of extended duration: none

The patient has a medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuate by medication or psychosocial support, and the following: current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such arrangement.

## Mario Balmaseda, M.D., 1/16/03, Tr. 535

EMG impression: mild carpal tunnel syndrome of the left side with no evidence of nerve fiber damage.

**Mario Balmaseda, M.D., 1/16/03, Tr. 537**
EMG impression: EMG evidence of mild carpal tunnel syndrome of the left side with no evidence of nerve fiber damage

**Donald R. Lilly, M.D., 2/1/96, Tr. 540**
Principal diagnosis: false positive exercise stress thallium

Co-morbidity: tobacco abuse, hyperlipidemia, hiatal hernia, gastroesophageal reflux

**Donald R. Lilly, M.D., 1/31/96, Tr. 541**
Impression: unstable angina pectoris, positive exercise stress thallium, tobacco abuse, past alcohol abuse, hyperlipidemia, hiatal hernia, gastroesophageal reflux

**Antoine Katiny, M.D., 11/14/03, Tr. 562**
Impression: normal LV without wall motion abnormalities, normal LVEF at 55 %, trace AI, mild MR.

**Mary McJunkin, M.D., 11/13/03, Tr. 563**
Impression: there is a question of a small area of myocardial ischemia in the anterior wall with greater thickening on the resting images.

**David Namay, M.D., 12/17/03, Tr. 565**
Impression: chest pain, abnormal stress testing, family history of coronary disease, tobacco abuse, hyperlipidemia, major depression disorder, fibromyalgia, history of hiatal hernia with gastroesophageal reflux disease, asthma

**H. Chang, M.D., 8/8/75, Tr. 591**
Provisional diagnosis: acute cholecystitis, possible injury of back, chest pain

Final diagnosis: acute cholecystitis

**M. C. Chen, M.D., 3/5/76, Tr. 598**
Provisional diagnosis: acute abdomen

Final diagnosis: menorrhagia, acute upper respiratory infection, right breast nodule

**M. C. Chen, M.D., 3/13/76, Tr. 599**
Provisional diagnosis: nodules of the right breast

Final diagnosis: fibrocystic disease of the right breast

**M. C.  Chen, M.D., 2/12/76, Tr. 602**
Pre-operative diagnosis: right breast fibrocystic disease\

Post-operative diagnosis: same

**M. C. Chen, M.D., 3/15/76, Tr. 603**
Diagnosis: fibrocystic disease, mazoplasia

**M. C. Chen, M.D., 4/11/76, Tr. 605**
Provisional diagnosis: multiple blunt injuries

Final diagnosis: same

**M. C. Chen, M.D., 9/15/77, Tr. 606**
Final diagnosis: dysfunctional uterine bleeding

**M. C. Chen, M.D., 9/15/77, Tr. 607**
Provisional diagnosis: dysfunctional uterine bleeding

Final diagnosis: same

**M. C. Chen, M.D., 11/5/77, Tr. 609**
Provisional diagnosis: acute abdomen

Final diagnosis: acute gastritis, possible right oopho-salpingitis

**M. C. Chen, M.D., 11/5/77, Tr. 610**
Final diagnosis: acute gastritis, possible right oopho-salpingitis

**M. C. Chen, M.D., 8/8/76, Tr. 616**
Provisional diagnosis: severe neck pain and back injury from automobile accident

Final diagnosis: same

**M. C. Chen, M.D., 8/8/78, Tr. 620**
Admission diagnosis: severe neck pain and back injury from automobile accident

**H. Chang, M.D., 3/29/82, Tr. 621**
Provisional diagnosis: pain of the right lower quadrant of the abdomen, rule out acute appendicitis

Final diagnosis: pain of the right lower quadrant of the abdomen, with rebound tenderness, possible acute urinary tract infection

**A. Callejas, M.D., 10/5/82, Tr. 628**
Provisional diagnosis: chronic cholecystitis

Final diagnosis: same

**A. Callejas, M.D., 9/27/82, Tr. 630**
Impression: chronic cholecystitis with cholelithiasis

**B. Browning, D.O., 12/7/84, Tr. 638**
Provisional diagnosis: acute anxiety neurosis

Final diagnosis: acute anxiety neurosis, acute depression

**B. Browning, D.O., 12/5/84, Tr. 640**
Impression: acute anxiety neurosis, borderline diabetes mellitus, by history, goiter with hypothyroidism, by history, frequent vascular cephalgias, possibly related to neurosis, by history

**B. Browning, D.O., (Undated), Tr. 644**
Assessment: dysfunctional uterine bleeding unresponsive to out patient therapy, status post cholecystectomy, tubal litigation by history, depression by history, peptic ulcer disease by history

**B. Browning, D.O., 3/21/85, Tr. 645**
Provisional diagnosis: dysfunctional uterine bleeding

Final diagnosis: dysfunctional bleeding

**C. Diaz, M.D., 9/20/85, Tr. 652**
Provisional diagnosis: dysfunctional uterine bleeding, possibly due to endometritis

Final diagnosis: adenomyosis of uterus, chronic cervicitis, squamous metaplasia cervix

**(Signature illegible), (date illegible), Tr. 655**
Impression of left humerus: possible proximal humerus fracture

**G. B. Calero, M.D., 12/1/83, Tr. 662**
Provisional diagnosis: profuse vaginal bleeding, secondary to dysfunctional uterine bleeding

Final diagnosis: same

**G. B. Calero, M.D., 11/29/83, Tr. 665**
Pre-operative diagnosis: dysfunctional uterine bleeding with profuse vaginal bleeding for the last two weeks

Post-operative diagnosis: same

**G. B. Calero, M.D., 12/16/83, Tr. 671**

Provisional diagnosis: acute lower abdominal pain, rule out possibility of pelvic abscess

Final diagnosis: left ovarian cyst, hiatus hernia

**David Lee Cochran, D.O., 11/10/92, Tr. 676**
Initial impression: peptic ulcer disease, rule out gastritis and helicobacter pylorogastritis, major depression with agitated features, causalgia, left upper extremity

**David Lee Cochran, D.O., 11/2/92, Tr. 680**
The patient has helicobacter pylorogastritis documented by tissue study and EGD, causalgia, left arm, major depression with agitated features, nodular goiter

**David Lee Cochran, D.O., 11/2/92, Tr. 681**
Provisional diagnosis: peptic ulcer disease, rule out gastritis and helicobacter pylorogastritis, major depression with agitated features (by history), causalgia, left upper extremity

Final diagnosis: helicobacter pylorogastritis documented by tissue study and EGD, causalgia, left arm, major depression with agitated features, nodular goiter

**Joe Othman, D.O., 2/3/93, Tr. 690**
Impression: left carpal tunnel syndrome and mild left ulnar neuropathy at the elbow

**C. Diaz, M.D., 2/19/93, Tr. 700**
Pre-operative diagnosis: left carpal tunnel syndrome

Post-operative diagnosis: same

**Clemente Diaz, M.D., 4/4/95, Tr. 714**
Impression: nodule of the left breast

**Clemente Diaz, M.D., 4/6/95, Tr. 715**
Pre-operative diagnosis: nodule of the left breast

Post-operative diagnosis: same

**Clemente Diaz, M.D., 4/7/95, Tr. 716**
Pre-operative diagnosis: nodule of the left breast

Post-operative diagnosis: same

**Clemente Diaz, M.D., 6/8/95, Tr. 718**
Impression: entrapment of the ulnar nerve on the left side at the level of the elbow.

**Clemente Diaz, M.D., 4/13/95, Tr. 719**

Pre-operative diagnosis: entrapping of the ulna nerve

Post-operative diagnosis: same

**Clemente Diaz, M.D., 9/25/95, Tr. 725**
Impression: chronic PID/FOR removal of right tube and ovary

**Clemente Diaz, M.D., 9/25/95, Tr. 728**
Pre-operative diagnosis: chronic PID

Post-operative diagnosis: chronic PID and massive pelvic adhesions

**Mete Altug, M.D., 9/25/95, Tr. 729**
Final microscopic diagnosis: the right ovary shows serosal fibrous adhesions and focal fibrous capsular thickening, multiple follicular cysts and cystic corpus leteum, and a portion of the follopian tube shows mild hydrosalpinx

**Clemente Diaz, M.D., 9/25/95, Tr. 731**
Provisional diagnosis: chronic PID, peritoneal adhesions

Final diagnosis: chronic PID, peritoneal adhesions

**Steven Hefter, M.D., 1/18/96, Tr. 746**
Conclusion: normal echo with mild redundancy of the anterior leaf-let. There are no other gross abnormalities.

**Sunita Greenberg, M.D., 1/18/96, Tr. 749**
Assessment: chest pain, decreased potassium and magnesium, history of peptic disease, glucose intolerance, sinus brady

**Clemente Diaz, M.D., 1/20/96, Tr. 762**
Pre-operative diagnosis: recurrent nausea and vomiting and chest pain, possible peptic ulcer

Post operative diagnosis: enterogastritis with esophageal reflux

**Clemente Diaz, M.D., 1/22/96, Tr. 763**
Diagnosis from biopsy of stomach antrum: mild superficial gastritis with foci of interstitial hemorrhage. There are abundant parietal cells.

Pre-operative diagnosis: persistent pp vomiting

Post-operative diagnosis: mild antral gastritis with reflux

**Sunita Greenberg, M.D., 1/31/96, Tr. 764**

Assessment: chest pain, reflux and gastritis, sinus brady, glucose intolerance, disabled secondary to MVA, elevated liver function test on last admission, history of alcohol abuse, hypomagnesemia

**Richard D. Gardner, M.D., 9/20/96, Tr. 777**
Assessment: chronic posterolateral pain, left ankle, status post ankle sprain 3 months ago

**Richard D. Gardner, M.D., 11/10/97, Tr. 781**
Impression: rhomboid strain

**Thomas A. Collings, Jr., M.D., 12/15/97, Tr. 792**
Clinical impression: a right cervical radiculoploxopathy was not demonstrated, severe (chronic) left carpal tunnel syndrome

**Frank F. Phillips, M.D., 6/15/98, Tr. 804**
Impression: acute impingement syndrome, right shoulder

**Frank F. Phillips, M.D., 1/25/99, Tr. 811**
Impression: contusion of the right knee

**Glenn L. Scott, M.D., P.A., 5/5/99, Tr. 817**
Impression: infrapatellar neuropraxia or neuroma, possible internal derangement

**Richard S. Trenbath, M.D., 4/8/02, Tr. 846**
Assessment: chronic depression, possible fibromyalgia with chronic pain, history of multiple medications

**Community Clinic of Nicholas County, Inc., 1/28/02, Tr. 849**
Assessment: fibromyalgia, chronic pain, depression

D.      Testimonial Evidence

Testimony was taken at the December 11, 2003 hearing. The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q       And have you continued to have any difficulty with either of those parts of your body?

A       Yes. I can't use my left arm. I don't have any strength in it.

ALJ         So you have movement in your fingers?

CLMT        I can move them but there was no strength in that hand.

ALJ         Okay.  So you have no use whatsoever as far as your left hand?

CLMT        Very little.

                        *               *               *

BY ATTORNEY:

Q       And so at one time were you a very heavy smoker as well?

A       Yes.

Q       How many packs of cigarettes were you smoking?

A       A pack-and-a-half or two, two packs or three.  It just depends on how bad my
nerves are.

Q       All right.  Do you attribute the amount of smoking to your nerves?

A       Yes.

Q       And have you, as a result of the breathing problems, made a change in the amount
that you have been smoking?

A       Yes.  I attempted to quit but I couldn't do it.

Q       How much?  Did you cut down?

A       Yes.

Q       How much did you cut down?

A       About a pack-and-a-half a day.  I went two to three packs.

Q       At one point you had gotten down lower than that?

A       Yeah.  A pack and some times a half a pack.  It just varies.

Q      Are you still trying to quit?

A      Yes.

*              *              *

Q      Tell me a little bit about how you feel in the daytime as far as like your energy, your attitude, or your mood during the day?

A      I have very little energy.  I mean, my mood varies.  I go from being happy one minute to the next minute I am ready to fight, you know.  I just don't want nobody to bother me.

Q      In the course of just an ordinary day, you indicated that your mood varies. Does it vary during the day, or does it vary every few days?

A      It's every day.  I mean, like I have no control over it.

Q      Could you describe for me what happens?  If I were in the room would I be able to tell how you were feeling, and what kind of mood you were in?

A      Yes.

Q      How would I know?  How do you behave?

A      By the things I say and the way I talk.

Q      Tell me about that.

A      I talk hateful and smart mouth, you know, which I shouldn't.

*              *              *

Q      Now in between that period though did you not go back to South Carolina and make that work attempt?

A      Yes.  I went back in November [of 2001].

Q      Okay.  Tell me about that.

20

A        In November.  And I left again in January.

Q        Okay.  Now was there any particular reason for going back to South Carolina in November?

A        Trying to work things out and make the marriage work.

Q        Okay.  And when you returned to work in December, were you feeling some better? Did you feel that you might be able to handle it at that point?

A        Well, my husband told me that I needed to go to work because we needed the money, but I didn't feel that I could do it but I was willing to try.

Q        When you went back to work, I think you said it was December something.

A        The 24th.

Q        December 24th.   The day before Christmas?

A        Yes.

Q        And where were you working then, and how did you get along?

A        At Magnolia (INAUDIBLE).

Q        Now is that a place that you had never worked before?

A        No.  That was in an assisted living facility.  I had worked there before.

Q        Okay.

A        That was when I did the med tech and gave meds and took care of, you know, bathing, and dressing and feeding, and things like that.

Q        Okay.  And so you, what difficulty did you have, if any, during that time period, and why did you stop work?

A        My back and parts of my body were hurting that shouldn't have been hurting, and

that is when I went to the doctor.  They checked me for the fibromyalgia and found it.

Q       Okay.  Now that was in December of 2001.

A       Yes.

                        *               *               *

Q       What the Judge would like to know is how you were getting along during that period, and approximately what your abilities and your limitations were physically during that time period?

A       I couldn't do the housework.  The house stayed a mess all the time.

Q       And why was that?

A       Because I wasn't able to do it and I couldn't get no one to help me clean it.

Q       Well, was it that you couldn't do it, or that you didn't want to do it?  I mean, tell me a little bit about it.

A       I wanted to do it but I just couldn't.  I mean - -

Q       What was the problem?  Why couldn't you do it?

A       The pain hurt me so bad when I would get up.  My knees would give out completely out from under me.  My right knee where I had messed it up.

                        *               *               *

Q       Were you having any of the symptoms?  Let me see how I can ask you this.  Try to tell me specifically.  In other words, thinking back during that time period, try to think specifically what things you couldn't do, and what things you could do so that the Judge would have some idea of what your physical activity level was back then?

A       I couldn't make beds.  I couldn't hardly wash dishes because I couldn't stand very

long.  I could not run the vacuum cleaner.

Q       Okay.  Did you have any difficulty with fatigue?

A       Yes.  I stayed tired all the time.

Q       Now one thing.  Apparently, when you were being treated  before this time
period, you had undergone some physical therapy, and they had increased your lifting capacity
considerably, had they not?

A       Fifty pounds.

Q       Okay.  Did that continue approximately?

A       Yes.

Q       In other words, that was about your lifting limit, and how often did you have an
occasion to lift that much?

A       I had to do it when I worked all the time.

Q       Was that difficult for you, or were you able to do it?

A       Yes.  It was very difficult.

Q       When you went back to work in December of 2001, the day before Christmas,
were you lifting and handling the patients the way you had done before?

A       I was trying but I had to have someone help me do it.

Q       And what do you mean by that?

A       I couldn't lift them on my own, you know, even the smaller ones.

Q       Okay.

A       The ones that I had lifted before well, the same size people because a lot of them
weren't the same.  But I just couldn't lift them like I normally could.

Q       Like you would have?

A       Yeah.

                        *               *               *

BY ATTORNEY:

Q       Well, it sounds like, lifting even though this was difficult, that lifting is not necessarily your main problem as far as being able to do things.  Is that right or wrong?

A       Yes.

Q       What bothers you?  I mean, let me ask you about just standing.  You mentioned that you had trouble doing the dishes because you couldn't stand very long.   What is it about the standing that bothers you?

A       My legs and my back.

Q       Well, tell me about your back first, and then tell me about your legs?

A       It is just a steady drop.  I mean, every time my heart would beat my legs would get weak.  I've had them to fall completely out from under me, and I fell, you know.

Q       Okay.  Approximately how long were you able to stand if you can estimate, from about August of 2001 up until when you went to work at the - -

A       Half hour or 45 minutes.

Q       All right.  And when you had to sit down what was the reason that you had to sit down?

A       Because of my back and legs hurting me real bad.

Q       When you went back to work, were you having this difficult standing?  Were you having trouble while you were working doing this?

A       Yes.

Q       Were you allowed any ability to sit down, or take rests, or anything like that?

A       Well, yes.  When I didn't have to answer a call or give meds, I had to sit and do paperwork.  So that helped some.

Q       Okay.  What kind of paperwork did you do?

A       Write notes on the, on each resident.

Q       What you had done?

A       What I had given them.  Yes.

Q       Like the medicine that you gave them?

A       When I gave it to them.

Q       Okay.  Did the nursing home know about your problems?

A       Yes.

Q       When you said that you had help with patients that you formerly hadn't had to have help with, or the size of the patients.

        Did the nursing home give you additional help because of your health problems?

A       The other girls that worked with me we, you know.  We helped each other.

Q       So if I understand what you are saying, the employers did not make any special allowances?

A       No.

Q       Your co-workers.  Were they aware of the difficulties that you were having?

A       Yes.

Q       Do they give you - - let's see.  Do you know whether or not you needed any more

help doing tasks that your co-workers were doing?

A    Yes.

Q    And was there anything specific about that work that caused it to end in January

of 2002, or was your decision to stop based on something else?

A    No.  I just couldn't handle the work.

Q    What was going on with you and your husband during that time period?

A    We was in the process of divorcing and separating.

Q    Did he realize that you had made an effort to do what he had told you to do, and

made an effort to work?

A    Yes.

Q    What?

A    It wasn't good enough for him.  He kept telling me I was able to work.

Q    Now when you moved back to West Virginia, did you move back with your son?

A    Yes.

*          *          *

Q    You fell apart and couldn't do anything after January of 2002.  Do you feel that

you would have been able to work full time at some job between August of 2001, and when you

returned to work on December 24th, 2001?

A    No.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q    Could you tell me what it shows as far as the claimants's vocational background?

A       It shows an individual with a limited education completing the eighth grade, plus achieving a certification as a nursing assistant through on the job training.  Her last job was that of a nursing assistant, or a medical technician, and these are classified as medium semi-skilled jobs, Your Honor.

She worked at several places it looks like back to 1998.  Before that there was a record in 1995 as a grill cook in a restaurant.  This would be classified as light or medium depending on the lifting involved.  It is semi-skilled work.

VE              Did you have to lift more than 20 pounds when you were a grill cook?

CLMT            Yes.

VE              It would be medium skilled work, or semi-skilled work.  I'm sorry.  It would be medium semi-skilled.  And there were two jobs that I didn't know what they were.  It was the King's Truck Stop in '94 and Shoney's.  What did you do there?

CLMT            I was a cook.

VE              A cook at both places?

CLMT            Yes.

VE              The same amount of lifting involved?

CLMT            Yes.

VE              Again, Your Honor, medium semi-skilled.

REEXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       Any transferable skills to light or sedentary jobs?

A       No, Your Honor.

Q        Okay.  As far as a hypothetical individual, we have a hypothetical individual with the similar vocational background as the claimant, and this hypothetical individual has the limitations that the claimant stated during the hearing today that she had.

Based on those limitations, could you render an opinion as far as whether or not she could do either her past jobs, or any other jobs that might exist in the national economy?

A        I guess I am a little confused.  She said she was through physical therapy, and after returning in a wheelchair and progressing from light duty she was increased to 50 pounds lifting.

Q        Oh, okay.  Well, I just want to know whether or not you feel that you have sufficient information.  Just listening to what she said, and based on what she said, could you make an opinion as far as her symptoms and limitations might be work preclusive?

A        From what she indicated, Your Honor, through the testimony I would say that her depression, her inability to be around people, and the amount of fatigue she experiences, specifically having to sit or lay down for prolonged periods during the day.  This would make it difficult for a person to function in competitive performance.

Q        In any kind of job?

A        Competitive work.  Yes.

*                *                *

Q        Now if I pose a hypothetical.  This time we have a hypothetical individual with similar age, education, and work history as the claimant and, hypothetically, this person could do work at the light exertional level.  Would have to avoid hazards or have to avoid excessive pulmonary irritants.  Also, would be just limited to simple routine type tasks that don't take a

great deal of concentration.  Just routine simple work and not highly stressful jobs as far as production quotas, or jobs that wouldn't entail working with the public, but would be working with things rather than with the public.

With that hypothetical, could you identify any jobs that might exist in the national economy that might fit that profile?

A      Yes, Your Honor.  There would be jobs that are routine or repetitive and dealing with things and not people, and no public involvement, and no hazards, and a relatively clean environment and low stress.

Some examples I could offer would be those of laundry folders.  There are 300 local and 48,000 in the nation.  There are mail room clerks.  There are 365 local and 152,000 in the nation.  Labelers and markers.  There are 300 local and 64,000 in the nation.

Q      Okay.  In your testimony here today did you consider The Dictionary of Occupational Titles?

A      Yes.  I did, Your Honor.

Q      Any conflicts between what you told me here today and what is in The Dictionary of Occupational Titles?

A      No, Your Honor.

ALJ      Okay.  Counsel, did you have some questions you wanted to ask Mr. Mahler?

ATTY      Yes.  I would.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      Mr. Mahler, looking at the jobs that you have identified.  I would like you to

assume that this person has severe carpal tunnel syndrome on the left hand, and this person might have the ability to have normal strength or a time or too gripping. But the hand fatigues very easily, and she doesn't have the ability to use it for prolonged or repetitive type of activity.

Now I am wondering if any of the jobs that you identified would require that type of repetitive stress to the left hand?

A Can I ask you? Is this her dominant hand?

Q No. It is not her dominant hand.

A Okay. I would say with the one hand fatiguing after a certain amount of time not being able to use it on a sustained basis, the laundry folder would not be possible. The laborer or marker could be achieved because this could be performed with the dominant hand and an assist from the non-dominant on occasion.

Q Okay.

A The mail clerk also being the dominant hand is all right. This could be performed primarily with the dominant hand with an assist occasionally from the non-dominant left hand.

Q Okay. Now I want you to assume that on the basis of the mental impairments, which have been diagnosed as bipolar, and separately as anxiety and depression. I want you to assume that approximately 50 percent efficiency as far as maintaining a work schedule. In other words, I'm not sure that you noted the definition of moderate on the form that the Judge asked you to look at.

A No. I didn't.

Q All right. That is defined, that definition of moderate is defined somewhat more.

ALJ I'll let him look at it.

ATTY   Well, let him look at it.  Yeah.

ALJ   Take a look at this.  The definitions are at the top of the page.

BY ATTORNEY:

Q  Up at the top of the page.

A  Moderate would be indicating limited for one-third to one-half of the work day, and that would be a moderate limitation as defined on this form.

Q  Right.  So I want you to assume that one-third to one-half of the time this person is going to be limited in maintaining the normal break schedule due to her nervous condition, and the symptoms that that produces.  And I would like for you also to assume that in addition to that, that the  person is going to need additional breaks that are not necessarily related to her mental condition.  And that is going to be due to the fatigue of fibromyalgia, and to physical pain which, although it might not prevent the performance of work activities some times, it would tend to cause her to need extra breaks.

And so when you combine the mental restrictions with the physical restrictions, we have a limitation that rises to the marked level in the ability to sustain a regular work schedule, such as a morning and afternoon break of 10 and 15 minutes, and 30 minutes to an hour at lunch.  And I'm wondering what, if any, impact that would have on the jobs you have identified?

A  This would preclude the individual from performing competitive employment.  You could not have additional breaks on a regular basis.  Occasionally, you could have one or two.  But on a regular basis if this person needed extra breaks for both physical and mental reasons, as you indicated, 50 percent of the time or marked which would be two-thirds of the time.  This person would be precluded from any competitive employment.

Q        Okay.  If that were true, would it matter whether her lifting level was 20 pounds, 10 pounds, five pounds?

A        No.  It would not.

*                *                *

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affected her daily life during the relevant period.

- Washed, bathed, dressed, and shaved herself (Tr. 154)

- Prepared for herself including dry cereal, sandwiches, frozen dinners, and canned foods (Tr. 155)

- Dusted furniture (Tr. 155)

- Did some laundry and occasionally vacuums (Tr. 155)

- Shopped for food, medication, and cigarettes (Tr. 156)

- Read newspapers for one hour per day (Tr. 156)

- Watched television for nine to ten hours per day and listened to the radio for two hours per day (Tr. 156)

- Sewed and quilted (Tr. 156)

- Visited family as often as she could (Tr. 156)

- Drove a car (Tr. 343)

- Smoked (Tr. 364, 900)

- Obesity (Tr. 445)

### III.  The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

Claimant argues the ALJ's decision lacks substantial evidence to support it.  Specifically, Claimant argues the ALJ erred: (1) in rejecting certain pieces of evidence dating from before the alleged onset date of disability, (2) in making an inadequate evaluation of the medical evidence at step three of the disability determination process, and (3) in determining Claimant was disabled from a date other than her alleged onset date without first obtaining the services of a medical expert.

Commissioner maintains that the ALJ's decision is supported by substantial evidence and should therefore be affirmed.  Commissioner argues the evidence does not demonstrate Claimant had a disability prior to the date found by the ALJ.  Commissioner also contends the ALJ properly analyzed Claimant's impairments under the medical listings.  Finally, Comissioner argues the ALJ did not err in assigning Claimant an onset date of disability other than the one alleged without the services of a medical expert.

B.  <u>The Standards</u>.

1.  <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to

show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

The ALJ's Rejection of Certain Evidence Admitted by the Appeals Council

Claimant first argues the ALJ erred in refusing to admit certain evidence she submitted, which was later included in the record by the Appeals Council.  Claimant argues this evidence was extremely relevant to determining her disability.

It is well established that "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence."  Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972).  Where the Appeals Council incorporates evidence into the record not considered by the ALJ, reviewing courts review the entire administrative record, not only that portion considered by the ALJ, in determining whether substantial evidence supports the ALJ's decision.  Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).  As the Fourth Circuit stated in another opinion, "We are obliged to review the record as a whole, including the evidence added to the administrative record by the Appeals Council subsequent to the ALJ's decision, in determining whether substantial evidence supports the ALJ's findings."  Thomas v. Comm'r of Social Security, 24 Fed. Appx. 158, 162 (4th Cir. 2001).

In this case, all the evidence Claimant argues the ALJ erred in refusing to admit was incorporated into the administrative record by the Appeals Council.  (Tr. 8).  It is therefore irrelevant that the ALJ declined to consider it.  Wilkins, 953 F.2d at 96.  Court review

encompasses all the evidence in the administrative record.  Id.  Therefore, Claimant's arguments that the ALJ should be reversed for failing to consider this evidence are without merit.

However, since the Court finds this case should be remanded for reasons to be discussed shortly, the Court takes the time to note that since the Appeals Council has incorporated the evidence the ALJ rejected into the record, the ALJ should that evidence on remand.  Cf. Eiseler v. Barnhart, 344 F. Supp. 2d 1019, 1029-1030 (E.D. Mich. 2004).  This is not to say, of course, that the ALJ must accord great weight to that evidence.  The ALJ remains the finder of fact whose factual conclusions are only reviewed for substantial evidence.  Hays, 907 F.2d at 1456.

II.

The ALJ's Consideration of the Medical Listings at Step Three of the Disability Determination

Claimant argues the ALJ gave insufficient consideration to her case at the third step of the disability inquiry.  Claimant makes three arguments of error under this heading.  First, she contends the ALJ gave an insufficient evaluation to one of the listings he identified as applicable. Second, she argues the ALJ failed to identify some listings she may qualify for disability under. Finally, Claimant argues the ALJ should have retained a medical expert to testify about whether she equaled a medical listing, even if she did not meet it.

Claimant argues the ALJ gave inadequate consideration to whether Claimant met the requirements for disability under listing 1.00 of the medical listings, which deals with musculoskeletal problems.  Claimant contends the ALJ should have more thoroughly explained his reasoning.  The ALJ's entire evaluation of whether Claimant met listing 1.00 consisted of stating that "The claimant's fibromyalgia for which she was diagnosed in January 2000 and her arthritis are not attended by clinical findings that satisfy the requirements of any of the

impairments detailed in Section 1.00." (Tr. 29).

As noted above, the ALJ must explicitly indicate the weight he gives to the relevant evidence in order for a reviewing court to find his opinion supported by substantial evidence. Gordon, 725 F.2d at 235-36. In Cook v. Heckler, 783 F.2d 1168, 1172-73 (4th Cir. 1986), the Fourth Circuit remanded a case where the ALJ failed to adequately explain his reasoning for finding the claimant did not meet a medical listing. The ALJ in that case gave a two sentence explanation for why the claimant's arthritis did not meet the requirements of listing 1.00. Id. The court found this summary explanation inadequate. Id. at 1173. The court held that "The ALJ should have identified the relevant listed impairments. He then should have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." Id.

Like the Cook court, this Court believes the ALJ's opinion about whether Claimant's impairments meet the requirements of listing 1.00 lacks substantial evidence due to its summary conclusion. The ALJ did not identify which listing or listings under 1.00 he evaluated Claimant's fibromyalgia and arthritis under. (Tr. 29). He did not state how Claimant's impairments compare to the requirements of the listings. (Id.). He simply stated Claimant did not meeting the disability requirements and went no further. (Id.). This is plainly insufficient under Cook, 783 F.2d at 1172-73.

Claimant next argues the ALJ erred in not considering whether her impairments meet listing 14.09D. Claimant argues she suffers from sufficient symptoms so the listing should have been considered. Claimant points to her fibromyalgia as a reason for using this listing.

Commissioner contends a diagnosis of fibromyalgia is insufficient to meet listing 14.09D.

In relevant part, listing 14.09D provides for a finding of disability where a person demonstrates as follows:

> 14.09.  Inflammatory Arthritis.  Documented as described in 14.00B6, with one of the following:
>
> . . .
>
> D.  Inflammatory arthritis, with signs of peripheral joint inflammation on current examination, but with lesser joint involvement than in A and lesser extra-articular features than in C, and:
>
> 1.  Significant, documented constitutional symptoms and signs (e.g., fatigue, fever, malaise, weight loss), and
>
> 2.  Involvement of two or more organs/body systems (see 14.00B6d).  At least one of the organs/body systems must be involved to at least a moderate level of severity.

20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09.  The listing indicates that meeting the requirements of listing 14.00B6 is a prerequisite to consideration under listing 14.09D.  20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09.  Listing 14.00B6 defines inflammatory arthritis by stating:

> 6.  Inflammatory arthritis (14.09) includes a vast array of disorders that differ in cause, course, and outcome.  For example, inflammatory spondyloarthropathies include ankylosing spondylitis, Reiter's syndrome and other reactive arthropathies, psoriatic arthropathy, Behçet's disease, and Whipple's disease, as well as undifferentiated spondylitis.  Inflammatory arthritis of peripheral joints likewise comprises many disorders, including rheumatoid arthritis, Sjögren's syndrome, psoriatic arthritis, crystal deposition disorders, and Lyme disease.  Clinically, inflammation of major joints may be the dominant problem causing difficulties with ambulation or fine and gross movements, or the arthritis may involve other joints or cause less restriction of ambulation or other movements but be complicated by extra-articular features that cumulatively result in serious functional deficit.  When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02, or, if there has been surgical reconstruction, 1.03.

20 C.F.R. pt. 404, subpt. P, app. 1, § 14.00B6.  The ALJ did not consider whether Claimant met

listing 14.09D, thereby finding it irrelevant.  (Tr. 29).  The ALJ's findings will be upheld as long as they are supported by substantial evidence.  Hays, 907 F.2d at 1456.

The Court believes substantial evidence supports the ALJ's decision not to evaluate Claimant's impairments under listing 14.09D since evidence is lacking regarding the definition of inflammatory arthritis under 14.00B6.  As mentioned above, this is a requirement for qualifying for disability under 14.09D.  20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09.  Listing 14.00B6 provides that the listing does not cover situations where "ongoing inflammation" is not present or where it is present, yet surgery has been used as a corrective measure.  The record reveals Claimant experienced pain and inflammation in her right knee in 1999.  (Tr. 185). Claimant had surgery to correct this problem in May 1999.  (Tr. 186).  Since Claimant had surgery, this problem may not serve as a basis for disability under listing 14.09.  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 14.00B6; 14.09.  It appears the remaining notations concerning arthritis are simply bare notations without explanation.  (Tr. 288, 343).  Given this lack of evidence, the Court cannot say it was error for the ALJ to decline to evaluate Claimant's impairments under listing 14.09D.

Claimant finally argues under this heading that the ALJ erred in failing to retain the services of a medical expert.  Claimant contends the medical expert could have provided further elaboration on the record and could have testified about whether Claimant equaled a medical listing.  Commissioner contends adequate evidence existed to find against disability and therefore no medical expert was necessary.

The ALJ has a duty to develop an adequate factual record.  Cook, 783 F.2d at 1173. Where a claimant fails to submit a sufficient evidentiary record, the ALJ has a duty to take the

initiate and develop the record.  Id.

Upon review of the record, the Court concludes the ALJ should have retained a medical expert to testify regarding the severity of Claimant's fibromyalgia, arthritis, and asthma.  The ALJ found these impairments to be severe.  (Tr. 29).  Yet the record contains little evidence from Claimant's treating physicians regarding the severity of these impairments during the relevant time period.  Indeed, most of the notations regarding these impairments are simply summary statements that Claimant has the impairment.  (Tr. 288, 343, 335, 568).  Where any explanation does exist, it is brief at best.  (Tr. 228).  It is simply not possible to determine the severity of Claimant's fibromyalgia, arthritis, and asthma.  Therefore, this case should be remanded so the ALJ may employ a medical expert to testify regarding these impairments.  20 C.F.R. § 404.1527(f)(2)(iii); 416.929(b).

III.

Whether the ALJ Should Have Employed a Medical Expert Before Finding an Onset Date Other than as Alleged by Claimant

Finally, Claimant argues the ALJ should have employed a medical expert to determine her onset date of disability before fixing it at October 16, 2003.  Claimant argues the record discloses that except for coronary artery disease, all the impairments the ALJ found severe existed before this date.  Commissioner contends the record fails to disclose Claimant suffered from a disability before the date determined by the ALJ.

As noted above, the Court has found this case should be remanded so the ALJ may obtain a medical expert to testify about the severity of Claimant's arthritis, fibromyalgia, and asthma during the relevant time period.  In light of this finding, the Court considers it unnecessary to determine whether the ALJ should have used a medical expert to opine on the precise date of

41

disability before assigning Claimant a disability date of October 16, 2003.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to Commissioner so the ALJ may more thoroughly explain his analysis of Claimant's impairments compared to medical listing 1.00 and so the ALJ may retain a medical expert to testify regarding the severity of Claimant's fibromyalgia, arthritis, and asthma during the relevant time period.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears pro se and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: April 20, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE